UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JESSICA JIMENEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 1:14-cv-00627-RLY-MJD |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ENTRY ON PLAINTIFF'S OBJECTION TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Jessica Jimenez, filed a request for judicial review of the final decision of the Commissioner of the Social Security Administration denying her application for Supplemental Security Insurance Benefits ("DIB") under Title II and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). See 42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3). The court referred the matter to the Magistrate Judge, who recommends that this court uphold the final decision of the Commissioner based on findings that: (1) the ALJ properly weighed the medical evidence in determining Plaintiff's residual functional capacity and (2) the ALJ properly evaluated Plaintiff's credibility. (Filing No. 16). Plaintiff objects to both of the recommended findings. The Commissioner did not respond. For the reasons set forth below, the court **SUSTAINS** the Plaintiff's Objection and **REVERSES** the ALJ's decision denying benefits.

1

## I. Background

Plaintiff filed her applications for DIB and SSI on March 21, 2011, alleging an onset of disability of July 22, 2009, due to her numerous medical ailments including "degenerative disc disease, obesity, headaches, various gastrointestinal impairments, bipolar disorder, personality disorder, and anxiety disorder." Plaintiff's applications were denied initially on May 26, 2011, and denied on reconsideration on August 12, 2011. Plaintiff timely requested a hearing, which was held before Administrative Law Judge Angela Miranda ("ALJ") by video teleconference on April 16, 2012. The ALJ's November 30, 2012 decision also denied Plaintiff's applications for DIB and SSI, and on January 22, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision for purposes of judicial review.

## II. Legal Standard

To be eligible for SSI, a claimant must have a disability, defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i). In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis: (1) if the claimant is engaged in substantial gainful activity, she is not disabled; (2) if the claimant does not have a "severe" impairment that significantly limits her ability to perform basic work activities, she is not disabled; (3) if the Commissioner determines that the claimant's impairment meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt.

2

404, subpt. P, App. 1, the claimant is not disabled; (4) if the claimant is not found to be disabled at step three and she is able to perform her past relevant work, she is not disabled; and (5) if he claimant can perform certain other available work, she is not disabled.  20 C.F.R. § 404.1520.

The Commissioner's decision must be upheld if it "applies the correct legal standard and is supported by substantial evidence." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).  "Although a mere scintilla of proof will not suffice to uphold an ALJ's findings, the substantial evidence standard requires no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Blakes v. Barnhart*, 331 F.3d 565, 568 (7th Cir. 2003).  The ALJ is obligated "to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).  "A decision denying benefits need not discuss every piece of evidence, but if it lacks an adequate discussion of the issues, it will be remanded." *See Campbell*, 627 F.3d at 306.  An adequate discussion ensures that the ALJ built a "logical bridge" from the evidence to her conclusion.  *Denton*, 596 F.3d at 425.

### III.  The ALJ's Decision

At step two, the ALJ found that the Plaintiff had the following severe impairments: (1) obesity; (2) mental impairments variously assessed as bipolar disorder, personality disorder, and anxiety; (3) degenerative disc disease, thoracic spine abnormalities; and (4) headaches with evidence of sinusitis.  (R. at 25).  However, at step

3

three, the ALJ found that Plaintiff did not have an impairment or a combination of impairments that meets or medically equals the severity of one of the listed impairments as follows: Listing 1.00 for ineffective ambulation, Listing 1.04 for disorders of the spine, Listing 11.00 et seq. for her headaches, and Listings 12.04, 12.06, and 12.08 for her mental impairments. (R. at 27-29).

At step three but before step four, the ALJ determined that Plaintiff has the residual functional capacity to perform "light work . . . with postural, environmental, and mental limitations more specifically described below." (R. at 29). Specifically, the ALJ found the following limitations to Plaintiff's ability to perform light work:

> [T]he claimant has the capacity to occasionally lift and carry 20 pounds and to frequently lift and carry 10 pounds. The claimant has the unlimited capacity to push and pull up to the weight capacity for lifting and carrying. The claimant has the capacity to stand and walk 6-8 hours in an 8-hour workday and has the capacity to sit 6-8 hours in an 8-hour workday. The claimant may require the ability to change position for momentary symptoms relief but that can be done without leaving the workstation. The claimant has the capacity to frequently balance; to occasionally stoop, crouch, and climb stairs and ramps; but the claimant should never be required to kneel, crawl, or climb ladders, ropes, or scaffolds in the workplace. . . . Mentally the claimant has the capacity to use common sense understanding to carryout instructions, to deal with several concrete variables in standardized situations, and to perform these mental abilities consistent with the demands of a normal workday schedule. . . . Occasional interaction with coworkers and general-public was defined as having the ability to work in vicinity of coworkers and the general-public, but actual interaction for completion of job tasks is limited to one third of the workday. . . .

(R. at 29).

**IV. Analysis**

    **A. Weight of the Medical Evidence**

The first issue raised is whether the ALJ properly weighed the medical opinions of treating physicians, Dr. Dorothy Boersma and Dr. Marwan Ghabril, and Nurse Practitioner Shane Dulemba ("N.P. Dulemba"), when determining Plaintiff's residual functional capacity. The court will begin with the opinion of Dr. Boersma.

### 1. Dr. Boersma

The ALJ discounted the opinions of Plaintiff's treating physician, Dr. Boersma, who opined Plaintiff could not perform even sedentary work, because her assessments "rely heavily on subjective complaints and are contradicted by contemporary treatment notes from other sources." (R. at 36). The ALJ gave "significant weight" to the assessment provided by the State agency medical and psychological consultants, who opined the claimant could perform a reduced range of light work – work requiring no more than simple, routine tasks with reduced social interaction. (R. at 36). Plaintiff objects to the Magistrate Judge's recommendation that the ALJ properly rejected the opinions from Dr. Boersma.

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. *See*, 20 C.F.R. § 414.1527(c)(2). "[M]ore weight is generally given to the opinion of a treating physician because of h[er] greater familiarity with the claimant's conditions and circumstances." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. § 404.1527(c)(2).

The ALJ gave Dr. Boersma's April 2011 assessment that Plaintiff was capable of far less than sedentary work "limited weight." (R. at 34). Although the ALJ found the

5

2011 assessment was based on objective medical tests which showed limited strength in Plaintiff's left ankle and Plaintiff's use of a rolling walker, she concludes subsequent examinations contradict the assessment. She explains:

> The report does show, however, the claimant could rise from a chair. (Ex. 21F/59). A subsequent examination report from Dr. Boersma did not address or chronicle these supposedly extensive limitations (Ex. 26F/55). A second examination report from May 2011 described no acute distress and again did not hint at any objective confirmation of those limitations (Ex. 26F/57).

(R. at 34).

Plaintiff saw Dr. Boersma on April 22, 2011, for "disability paperwork for her attorney." (Ex. 21F/59, R. at 2349). The doctor's notes state, "Able to walk in from waiting room with rolling walker. Able to get up and down from chair without assistance. Unable to get up on exam table due to weakness." (*Id.*). The subsequent examinations referenced by the ALJ were on April 26, 2011, for a follow-up appointment following a trip to the emergency room for bronchitis, (Ex. 26F, page 55, R. at 2458), and on May 18, 2011, for an appointment to discuss Plaintiff's concerns regarding her immune system, kidney function, and "chronic diarrhea." (Exhibit 26F, page 57, R. at 2460). In neither follow-up appointment does Dr. Boersma discuss Plaintiff's ambulatory limitations. The reasons for Plaintiff's appointments, however, were for reasons wholly unrelated to her ability to ambulate; thus, the doctor's failure to comment on Plaintiff's ambulatory limitations is not necessarily inconsistent with her April 22 assessment.

6

The ALJ next concludes that the "evidence from 2012 does not support the alleged profound limitations either." (R. at 35). She explains:

> A physical examination report was largely unremarkable and she continued to be assessed with lumbar herniation, though the assessment of cord compression was not verified in the objective portion of the report or by diagnostic imaging. (Ex. 31F/35). [Plaintiff] subsequently visited Dr. Boersma stating she could not get out of her wheelchair and that she needed to use a clavicle strap (Ex. 31F/5-6). Dr. Boersma indicated the claimant had reduced knee and grip strength, and could not walk in the office. (*Id*.). However, a report by another provider from the same day did not describe such limitations; in fact, a clinician's report was largely unremarkable and showed no muscle changes and no neurological deficits (Ex. 31F/40).

(R. at 35).

As Exhibit 31F, page 40 reflects, Plaintiff saw Dr. Boersma's nurse practitioner, Marla White ("N.P. White"), for an upper respiratory infection on the same day (February 13, 2012) she saw Dr. Boersma for a physical for purposes of her disability paperwork. (R. at 2538). Again, because Plaintiff presented for an upper respiratory infection, N.P. White's failure to comment on Plaintiff's ambulatory limitations is not *per se* inconsistent with the evidence in the record. Further, MRIs of Plaintiff's back from May and June 2010, noted in both disability assessments from Dr. Boersma, showed thoracic spine disc dehydration at T8-T9 and a right paracentral disc bulge at T10-T11, (R. at 689), lumbar spondylosis at L4-L5, and a small central disc bulge at L5-S1 (R. at 690). (R. at 2548, 1930). Even the physical therapy note from September 2010, referenced by the ALJ as showing Plaintiff's "stable walking and balancing," reflects that Plaintiff was able to ambulate "with assistive device with trunk leaning forward at times to relieve some of the back pain" and that her standing balance was "fair." (R. at 1969).

7

In giving significant weight to the non-examining state agency medical consultants, the ALJ reasoned that these reports "are consistent with many of the objective physical examination reports (e.g., Ex. 31F/35)." (R. at 36). The physical examination report from N.P. White cited by the ALJ (Ex. 31F/35) is curious, as the report states, "Plaintiff feels as if she is having increased pain in all joints of her body" and her Vicodin prescription is not handling the pain effectively. (R. at 2533). N.P. White assessed Plaintiff with lumbar disc herniation with cord compression, sciatica, generalized abdominal pain, and obesity. (R. at 2533).

Even more curious is the weight the ALJ gives to the state agency consultants' reports. Dr. Brill, a consultant who practices internal medicine, reviewed Plaintiff's file on May 24, 2011. (R. at 2268-2275). Dr. Brill referenced only one medical examination – Dr. Boersma's April 2011 medical examination regarding her disability paperwork – and the MRI and x-ray evidence. (R. at 2269-2270). No opinions on Plaintiff's physical capacities were available for review. (R. at 2274). Dr. Ruiz, board certified in family medicine, affirmed Dr. Brill's report, stating only, "The CT alleges [sic] no change in her physical impairments on the recon appli. Please see the add MER in file. It appears the initial dec/ass can be affirmed. Thanks." (Tr. at 2381).

"An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); 20 C.F.R. § 416.927(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined

8

you."). Here, Plaintiff's treating physician, Dr. Boersma, had the opportunity to physically examine Plaintiff and to order medical testing. After conducting these examinations, Dr. Boersma concluded that both clinical and diagnostic results supported her finding of disability. As set forth above, the evidence cited by the ALJ to show why Dr. Boersma's medical opinions were not entitled to controlling weight are not adequately supported by the medical evidence she cites.

Although the ALJ is not *required* to assign controlling weight to the medical opinions of treating physicians, SSR 96-2p, 1996 WL 374188, provides that such opinions "are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." Those factors include the length, nature, and extent of the physician's and claimant's treatment relationship, *see* 20 C.F.R. § 404.1527(c)(i) & (ii), whether the physician supported his or her opinions with sufficient explanations, *see id.*, § 404.1527(c)(3), whether the physician's opinion is consistent with the record as a whole, *see id.*, § 404.1527(c)(4), and whether the physician specializes in the medical conditions at issue, *see id*. § 404.1527(c)(5). The ALJ's lengthy opinion only addressed consistency, but as explained above, that analysis is problematic. Accordingly, Plaintiff's objection is **SUSTAINED** and the case is remanded for the ALJ to reevaluate whether Dr. Boersma's opinions are entitled to controlling weight.

### 2. Dr. Ghabril

The ALJ gave limited weight to the opinions of board certified gastroenterologist, Dr. Ghabril, who treated Plaintiff for H. Pylori gastritis and chronic diarrhea. She explained:

> I have afforded limited weight to the April 2011 assessment in which Dr. Ghabril indicated the claimant had H. Pylori and chronic diarrhea, but [sic] that condition was not related to work functioning (Ex. 9F/4-10). As set forth above, I have given the assessment limited weight because it is internally inconsistent and because it is inconsistent with Dr. Ghabril's earlier examination, in which he found nothing "dangerous" after a thorough examination (Ex. 15F/48).

The Magistrate Judge found the ALJ properly weighed the opinions of Dr. Ghabril.

Dr. Ghabril's April 2011 assessment explains that: (1) Plaintiff was on multiple medications for her gastrointestinal issues; (2) she experienced pain "frequently"; (3) her impairment was expected to last more than 12 months and began in approximately June 2010; and (4) she needed ready access to a bathroom in a work setting, the frequency of her bathroom breaks varied with the severity of the diarrhea, and such unscheduled breaks would last approximately 20 minutes. (R. at 1370-1374). Dr. Ghabril stated that his opinions were based on clinical evidence of chronic diarrhea, abdominal pain and cramps, malaise, fatigue, nausea, and pain, as well as diagnostic gastric biopsy results. (R. at 1371).

The ALJ discounted the opinion of Dr. Ghabril because he could not answer question 17, which asked him to "estimate your patient's residual functional capacity if your patient were placed in a normal **COMPETITIVE FIVE DAY A WEEK WORK ENVIRONMENT ON A SUSTAINED BASIS**." (R. at 1373-1374). Question 17.a. asked the doctor to consider how long (between 0-8 hours) Plaintiff could sit, stand or walk. (R. at 1374). Next to that question, Dr. Ghabril hand wrote "I cannot say." (R. at 1373). Question 17.b. asked the doctor to consider how many pounds the claimant can lift or carry. Next to that question, Dr. Ghabril hand wrote, "I have not evaluated these

parameters, [sic] they are not part of [] evaluation." (R. at 1374). On the last page of the assessment, Dr. Ghabril clarified that he had "no objective way" to answer those questions, and that he would "defer" to the "general medical opinion." (R. at 1370).

Dr. Ghabril's April 2011 assessment is not internally inconsistent. He merely explained why he, as a gastroenterologist, would not be qualified to render an opinion on Plaintiff's ability to sit, stand, walk, lift or carry due to her gastrointestinal issues. Dr. Ghabril's notation at the end of a March 2011 treatment note that he found "nothing dangerous" after a thorough GI evaluation is not inconsistent with the April 2011 assessment either. A review of that treatment note reflects that his reference to finding "nothing dangerous" was in response to Plaintiff's concerns about her health. (*See* R. at 1984) ("At this point, I have reassured her that I am not finding anything dangerous on a complete and very thorough GI evaluation.").

The weight to be given Dr. Ghabril's opinion must be determined by the ALJ considering the factors in 20 C.F.R. § 404.1527(c)(2)-(6). The evidence reflects that: (1) Dr. Ghabril treated Plaintiff from November 2010 to February 2011 for her gastrointestinal issues (R. at 1377); (2) Dr. Ghabril prescribed a number of medications for her condition and ordered tests that showed abnormalities (Tr. at 574, 1479); Dr. Ghabril provided support for his opinions as noted above (Tr. at 1371); his opinions are supported by the underlying record that documented diarrhea (Tr. at 536, 568, 766, 769, 789, 1136, 1326, and 1796) and abdominal pain (Tr. at 536, 769, and 1136); and Dr. Ghabril is a board certified gastroenterologist who regularly treats the type of gastrointestinal issues presented by Plaintiff. Because there is evidence in the record that

11

was not adequately explained by the ALJ, the Plaintiff's objection to the Magistrate Judge's recommendation is **SUSTAINED** and the case is remanded for the ALJ to reevaluate whether Dr. Ghabril's opinions are entitled to controlling weight or otherwise entitled to deference.

### 3. Nurse Practitioner Shane Dulemba

Finally, the ALJ gave limited weight to N.P. Dulemba's 2009 assessment of Plaintiff's mental impairments – bipolar disorder I and borderline personality disorder – and Plaintiff's GAF score of 40.[1] (R. at 2488-2495). She explained, "[The assessment] is inconsistent with sparse psychiatric care from the second half of 2009, and the subsequent reports of improvement in 2010 (Ex. 15F/113)." (R. at 37). She also discounted N.P. Dulemba's 2010 assessment because it "addresses the ultimate issue left for the Commissioner (SSR 96-5p) and is inconsistent with the treatment records from that time, most prominently Ms. McCane's report from just a few days earlier (Ex. 15F/113)." (*Id.*). Instead, the ALJ gave "significant weight" to the opinions from the non-examining state agency psychologists, who opined she retained the capability to do simple, routine work with reduced social interaction. (Tr. at 36). The Magistrate Judge found the ALJ properly evaluated N.P. Dulemba's opinions.

As already detailed above, the findings from non-examining sources are to be viewed skeptically when contradicted by evidence from a treating source. The first psychological consultant, Stacia Hill, Ph.D., reviewed Plaintiff's file on May 24, 2011.

---

[1] According to the Diagnostic and Statistical Manual, a GAF of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

(R. at 2250-2267).  In her functional capacity assessment, she noted a GAF score of 48 – considered a severe impairment under the Diagnostic and Statistical Manual – and referenced observations from an unnamed third party.  The third party observed that Plaintiff is depressed on a "daily basis," "spends most of her time in bed," she "does no cooking," "no household cleaning due to her physical condition and lack of energy due to her mental condition" and she "takes 1-2 showers per week and has to use a shower chair to do so."  (*Id.*).  She concludes that Plaintiff's "allegations appear partially credible" but opines that her activities of daily living are "primarily limited by physical conditions." (*Id.*).  She also noted that there were no opinions in the file on Plaintiff's mental functioning at the time and failed to indicate what medical evidence was considered. (*Id.*).  A second psychologist affirmed the findings from the first consultant without comment.  (R. at 2370).

    Although N.P. Dulemba is not an "acceptable medical source" as that term is used in the Commissioner's Regulations (20 C.F.R. §§ 404.1512, 416.912; 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)), and his opinions cannot be afforded controlling weight (20 C.F.R. §§ 404.1527(c), 416.927(c)(2)), the treating source's medical opinions must be considered and weighed appropriately.  The Regulations dictate that opinions from non-acceptable medical sources – such as evidence from a Nurse Practitioner – should be considered in determining "the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to do work." 20 C.F.R. § 404.1513(d) and § 416.913(d). Furthermore, SSR 0603p, 2006 WL 2329939, dictates that opinions from "other sources" may be used to show the severity of an individual's impairments.  The Ruling states that

13

the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and § 416.927(c)(2)-(6) should be applied when weighing the evidence from the other medical sources to the extent the factors apply.  *See also Philips v. Astrue*, 413 Fed. Appx. 878, 885-886 (7th Cir. 2010) (noting the ALJ must weigh sources that are not considered acceptable medical sources under SSR 0603p and the factors specified therein).

N.P. Dulemba stated that his opinions were based on psychiatric evidence of sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interest, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, manic syndrome, generalized persistent anxiety, and hostility and irritability.  (Tr. at 2489).  The Commissioner's Regulations, 20 C.F.R. § 404.1528 and § 416.928, identify observable psychiatric abnormalities as acceptable clinical and diagnostic techniques.  The Seventh Circuit has also noted the unique nature of mental impairments, the severity of which are not easily measured through traditional medical tests.  *Ziegler v. Astrue*, 336 Fed. Appx. 563, 569 (7th Cir. 2009) ("a psychiatrist's examination will often involve little more than analyzing self-reported symptoms . . . ."). *See also Medina v. California*, 505 U.S. 437, 451 (1992) ("Our cases recognize that '[t]he subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations,' because '[p]sychiatric diagnosis . . . is to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician.'") (quoting *Addington v. Texas*, 441 U.S. 418, 430 (1979)).

14

N.P. Dulemba has treated Plaintiff since August 2009. (R. at 1340). While the ALJ suggests that the treating source opinions were rejected in part because the treatment was sparse at the end of 2009, she failed to consider whether Plaintiff's mental impairments were the cause of her lack of treatment; instead, she assumed the lack of treatment reflected poorly upon the severity of her symptoms. This was error. *See, e.g., Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2014) ("ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medications supports an adverse credibility inference.").

The ALJ also erred by discounting N.P. Dulemba's 2009 and 2010 assessments because Plaintiff's social worker, Shannan McCane, observed in a September 2010 treatment note that Plaintiff's mood was "euthymic/stable," and that her speech was normal and thought processes were good. (R. at 2049). Subsequent treatment notes, however, chronicle the mood swings indicative of bipolar disorder, an episodic disease characterized by the extremes of mania on the one hand, and clinical depression on the other. *Bauer v. Astrue*, 532 F.3d 606, 607 (7th Cir. 2008) ("A person suffering from bipolar disorder has violent mood swings, the extremes of which are mania – a state of excitement in which he loses contact with reality and exhibits bizarre behavior – and clinical depression, in which he has great difficulty sleeping or concentrating."); (R. at 2117 (October 2010 treatment note showing Plaintiff in a "dysthymic mood"); R. at 1957 (March 2010 Care Plan noting that Plaintiff "has been manic for the last several weeks and notes she has not been sleeping more than three hours a night and feels exhausted but continues to have racing thoughts when she lies down to sleep."); R. at 2569 (April 2011

15

treatment note stating that "[Plaintiff] is tolerating Depakote but now in depressed phase.")). Thus, the September 2010 treatment note does not contradict the prior assessments. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("[A] person with who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition."); *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) ("[The ALJ] thought the medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving pretty normally during her office visits. There was no contradiction; bipolar disorder is episodic.").

Furthermore, the 2010 assessment does not impermissibly opine on an issue reserved to the Commissioner. In the assessment, written in letter form, N.P. Dulemba states, "I appreciate whatever you can do to help Jessica expedite her case as I do not expect her to be able to return to work and the financial needs are of a great concern to her and her family's success." (R. at 1246). Her reference of what she "expects" Plaintiff's prognosis to be is not written in conclusive terms. Accordingly, the Plaintiff's objection is **SUSTAINED** and this issue is remanded to the ALJ to determine the weight to be given N.P. Dulemba's assessments.

### B. Plaintiff's Credibility

The next and final issue is whether the ALJ properly evaluated Plaintiff's credibility, specifically with regard to her pain. The Commissioner's Regulations describe a two-step process to evaluate this type of subjective testimony. First, the ALJ must determine whether the pain alleged is supported by objective medical evidence that

could reasonably produce such pain. Second, the ALJ must evaluate the credibility of the claimant's subjective statements as to the intensity, persistence, and functionally limiting effect of the claimant's statements regarding pain. SSR 96-7p, 1996 WL 374186, interpreting 20 C.F.R. § 404.1529 and § 416.929. In evaluating a claimant's credibility, an ALJ must consider the entire case record, the claimant's statements, information from the claimant's treating or examining physicians or psychologists, and the objective medical evidence which would support allegations of pain. *Id*. The ALJ's credibility finding must contain specific reasons, must be supported by the evidence in the record, and must be sufficiently specific so as to aid the claimant and the reviewer in following such reasoning. *Id*. Because the ALJ "is in the best position to determine the credibility of witnesses," great deference is given to credibility determinations on appeal. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Although substantial evidence must support the ALJ's other findings, only a "patently wrong" credibility determination is overturned on appeal. *Id*.

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but found her statements concerning the intensity, persistence, and limiting effects of her symptoms were "unpersuasive to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 30). She explains:

> The subjective complaints and alleged limitations are disproportionate to limitations the record shows reasonably related to the medically determined impairments. The evidence shows instances where the claimant dramatizes the apparently more moderate information her treating sources told her. For example, when a lung nodule was found, she reported possibly having

17

>cancer, and when there were some abnormalities in her blood work, she was concerned about rheumatoid arthritis and lupus, though neither was assessed or otherwise confirmed by objective testing. She also reported she has sarcoidosis although that too was not determined. Lastly, she reported she nearly died during a colonoscopy and endoscopy, but the record shows that while her blood pressure did drop with the anesthesia, the procedure still was performed satisfactorily. Such inconsistencies take place throughout the record and reduce the persuasiveness of the allegations made when considered against the backdrop of the overall evidence, as set forth in detail below.

(*Id.*).

The ALJ's finding is difficult to review because she did not cite to the record to support her credibility findings, and the record is over 2,000 pages. Consequently, the court is unable to determine whether the ALJ built a logical bridge from the evidence to her conclusion. *Denton*, 596 F.3d 425. Furthermore, the court observes that in making her credibility determination, the ALJ did not take into consideration Plaintiff's mental impairments – bipolar disorder, borderline personality disorder, and anxiety. Given the nature of these impairments and the depression, fear, and worry that go along with them, the ALJ should have considered whether her mental impairments were the root cause of her apparent hypochondria.[2] In addition, the health issues Plaintiff allegedly "exaggerated" are not the health issues which precipitated her claim for disability, and there is no evidence in the medical record (or at least nothing cited to the court) to show

---

[2] A May 18, 2011 treatment note from Dr. Boersma appears to address at least some of these issues. (R. at 2460). Dr. Boersma notes that Plaintiff is to be scheduled for a bone-marrow biopsy with a different doctor due to Plaintiff's concern over her fluctuating white blood cell count. (*Id.*). She also notes Plaintiff's concern over the significance of "calcified granulomas" found in her chest CT scan. She writes, "[S]he had lived in house with black mold in past and was questioning this vs. histo vs. sarcoid." (*Id.*). Plaintiff's hyper-sensitivity to her health issues speaks more to a case of hypochrondria than with gross exaggeration.

that her treating and examining physicians believed she was exaggerating those health issues. The court therefore **SUSTAINS** Plaintiff's objection and remands this issue to the ALJ.

## V. Conclusion

For the foregoing reasons, Plaintiff's Objection to the Magistrate Judge's Report and Recommendation upholding the Commissioner's decision to deny benefits to Plaintiff, is **SUSTAINED**, and the case is **REMANDED** for further proceedings consistent with this opinion.

**SO ORDERED** this 21st day of July 2015.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.